

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**RAMON BAEZ**                                    A 2201692

**vs.**

**SMITHFIELD FOODS INC**

EFR200



EEOC Form 161-B (11/09)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Mr. Ramon Baez<br>3762 Charfield Lane<br>Fairfield, OH 45011 | From: | Cincinnati Area Office<br>550 Main Street, Suite 10191<br>Cincinnati, Ohio ,45202 |
|---|---|---|---|

| EEOC Charge No.<br>473-2021-00729 | EEOC Representative<br><br>William Coleman,<br>Investigator | Telephone No.<br>513-914-6013 |
|---|---|---|

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Ramiro Gutierrez,
Cincinnati, Area Director

Feb. 25, 2022

*(Date Mailed)*

Enclosures(s)

cc:

| Evan McFarland<br>Spitz Law Firm<br>Spectrum Office Tower<br>11260 Chester Road, Suite 825<br>Cincinnati, OH 45246 | Amy Keegan<br>Hunton Andrews Kurth<br>951 E Byrd St, Ste 200<br>Richmond, VA 23219 |
|---|---|

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   —   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within <u>90 days</u> of the date you** *receive* **this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   —   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   —   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   —   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*



| COURT OF COMMON PLEAS<br>HAMILTON COUNTY, OHIO | CLASSIFICATION FORM<br><br>WWW.COURTCLERK.ORG | AFTAB PUREVAL<br>CLERK OF COURTS |
|---|---|---|

CASE NUMBER:_____ PLAINTIFF: **Ramon Baez**

PURSUANT TO SUPERINTENDENCE RULE 4, THIS CASE WAS ORIGINALLY FILED AND DISMISSED

UNDER CASE NUMBER:_____ BY JUDGE _____

## PLEASE INDICATE CLASSIFICATION INTO WHICH THIS CASE FALLS (please only check one):

☐ Other Tort – C360
☐ Personal Injury – C310
☐ Wrongful Death – C320
☐ Vehicle Accident – C370

☐ Professional Tort – A300
☐ Personal Injury – A310
☐ Wrongful Death – A320
☐ Legal Malpractice – A330
☐ Medical Malpractice – A340

☐ Product Liability – B350
☐ Personal Injury – B310
☐ Wrongful Death – B320

☐ Worker's Compensation
☐ Non-Compliant Employer – D410
☐ Appeal – D420

☐ Administrative Appeals – F600
☐ Appeal Civil Service – F610
☐ Appeal Motor Vehicle – F620
☐ Appeal Unemployment – F630
☐ Appeal Liquor – F640
☐ Appeal Taxes – F650
☐ Appeal Zoning – F660

☐ Certificate of Qualification – H600

☑ Other Civil – H700-34
☐ Appropriation – H710
☐ Accounting – H720
☐ Beyond Jurisdiction –730
☐ Breach of Contract – 740
☐ Cancel Land Contract – 750
☐ Change of Venue – H760
☐ Class Action – H770
☐ Convey Declared Void – H780
☐ Declaratory Judgment – H790
☐ Discharge Mechanics Lien – H800
☐ Dissolve Partnership – H810
☐ CONSUMER SALES ACT (1345 ORC) – H820
☐ Check here if relief includes declaratory
   judgment, injunction or class action
   recovery – H825
☐ Habeas Corpus – H830
☐ Injunction – H840
☐ Mandamus – H850
☐ On Account – H860
☐ Partition – H870
☐ Quiet Title – H880
☐ Replevin – H890
☐ Sale of Real Estate – H900
☐ Specific Performance – 910
☐ Restraining Order – H920
☐ Testimony – H930-21
☐ Environmental – H940
☐ Cognovit – H950
☐ Menacing by Stalking – H960
   ] Repo Title – Transfer of Title Only – 970
   ] Repo Title – With Money Claim – H980
☐ Injunction Sexual Predator – 990
☐ SB 10 – Termination – H690
☐ SB 10 – Reclassification – H697

DATE: **05/11/2022**

ATTORNEY (PRINT): **Brianna Carden**

OHIO SUPREME COURT NUMBER: **0097961**

Revised 01/02/2017

Print

# Common Pleas Court of Hamilton County, Ohio Clerk of Courts

# INSTRUCTIONS FOR SERVICE

Ramon Baez
_____

PLAINTIFF(S)

Vs.

CASE NO. _____

Smithfield Foods, Inc.
_____

DEFENDANT(S)

## TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:

CERTIFIED MAIL SERVICE ✔        ORDINARY MAIL SERVICE___

PERSONAL SERVICE BY THE SHERIFF OF _____ COUNTY ___

RESIDENCE SERVICE BY THE SHERIFF OF _____ COUNTY ___

PERSONAL SERVICE BY PROCESS SERVER___

RESIDENCE SERVICE BY PROCESS SERVER___

**OF THE FOLLOWING DOCUMENTS**: Timestamped Complaint
_____

**UPON:**

| | |
|---|---|
| Smithfield Foods, Inc. | Smithfield Foods, Inc. |
| (NAME #1) | (NAME #2) |
| 805 E Kemper Rd. | c/o CT Corporation System (Stat. Agent) |
| (ADDRESS) | (ADDRESS) |
| | 4400 Easton Commons Way, Suite 125 |
| Cincinnati, OH 45246 | Columbus, OH 43219 |
| (CITY—STATE—ZIP CODE) | (CITY—STATE—ZIP CODE) |
| Smithfield Foods, Inc. | |
| (NAME #3) | (NAME #4) |
| Corp. Headquarters | |
| (ADDRESS) | (ADDRESS) |
| 200 Commerce Street | |
| Smithfield, VA 23430 | |
| (CITY—STATE—ZIP CODE) | (CITY—STATE—ZIP CODE) |

| | |
|---|---|
| Brianna Carden 0097961 | 11260 Chester Rd, Suite 825, Cincinnati, OH 45246 |
| **Attorney Name and Supreme Court I.D. No.** | **Address, City, State, Zip Code** |
| 216-291-4744 | |
| **Phone Number** | |

Reset

## IN THE COURT OF COMMON PLEAS
## FOR HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| RAMON BAEZ<br>3762 Charfield Ln.<br>Fairfield Township, OH 45011 | ) <br> ) <br> ) <br> ) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | ) <br> ) <br> ) | |
| v. | ) <br> ) | |
| SMITHFIELD FOODS, INC.<br>805 E Kemper Rd.<br>Cincinnati, OH 45246 | ) <br> ) <br> ) <br> ) | **COMPLAINT FOR**<br>**DAMAGES AND**<br>**INJUNCTIVE RELIEF** |
| **Serve also:** | ) <br> ) | **JURY DEMAND ENDORSED**<br>**HEREIN** |
| Smithfield Foods, Inc.<br>c/o CT Corporation System (Stat. Agent)<br>4400 Easton Commons Way, Suite 125<br>Columbus, OH 43219 | ) <br> ) <br> ) <br> ) <br> ) | |
| **-and-** | ) <br> ) | |
| Smithfield Foods, Inc.<br>Corp. Headquarters<br>200 Commerce Street<br>Smithfield, VA 23430 | ) <br> ) <br> ) <br> ) <br> ) | |
| Defendant. | ) <br> ) | |

Plaintiff Ramon Baez by and through undersigned counsel, as his Complaint against the Defendant, states and avers the following:

### PARTIES

1. Plaintiff is a resident of the city of Fairfield Township, Butler County, Ohio.

2. Defendant SMITHFIELD FOODS, INC. ("Smithfield") is a foreign-incorporated, for-profit company that conducts business throughout the state of Ohio and others.

3. The relevant location of the events and omissions of this Complaint took place was 805 E Kemper Rd., Cincinnati, OH 45246.

4. Smithfield is, and was at all times hereinafter mentioned, Plaintiff's employer within the meaning of the Americans with Disabilities Act of 1990 ("ADA") 42 U.S.C. § 12101, Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 et seq., Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C §2000e, and O.R.C. § 4112 et seq.

5. Within 300 days of the adverse employment actions described herein, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 473-2021-00729 ("EEOC Charge").

6. On or around February 25, 2022, the EEOC issued and mailed a Notice of Right to Sue letter to Plaintiff regarding the EEOC Charge.

7. Plaintiff received the Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which had been attached hereto as Plaintiff's Exhibit1.

8. Plaintiff has filed this Complaint on or before the 90-day deadline set forth in the Notice of Right to Sue letter.

9. Plaintiff has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

### JURISDICTION & VENUE

10. All of the material events alleged in this Complaint occurred in or around Hamilton County, Ohio.

11. Therefore, personal jurisdiction is proper over Defendant pursuant to R.C. § 2307.382(A)(1) and/or (3).

12. Venue is proper pursuant to Civ. R. 3(C)(1), (3), and/or (6).

2

13. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

14. Plaintiff is a former employee of Smithfield.

15. At all times noted herein, Plaintiff was qualified for his position(s) with Smithfield.

16. At all times noted herein, Plaintiff could fully perform the essential functions of his job(s), with or without a reasonable accommodation.

17. Plaintiff worked for Smithfield, ending as a manufacturing mechanic and supervisor, from 2013 until Smithfield unlawfully terminated Plaintiff's employment on December 18, 2020.

18. Plaintiff is Hispanic was originally born in the Dominican Republic, placing him in protected classes for his race and national origin, respectively.

19. Plaintiff's wife was pregnant during his employment with Smithfield, placing him also in the protected pregnancy class by association.

20. Plaintiff is also a father to an asthmatic child. He is thus in the protected class for disability by association as well.

21. Plaintiff had an exemplary employment record in the years that Plaintiff worked for Smithfield. He regularly received positive reviews and pay raises.

22. Smithfield even promoted Plaintiff from manufacturing mechanic to manufacturing supervisor in 2014.

23. Plaintiff was working happily in his new role without a hitch until he caught a pair of employees engaged in inappropriate conduct at work.

3

24. Plaintiff reported his observations to Brett Smith, a Caucasian male in human resources, and sent the involved employees home.

25. The next day, Smith contacted Plaintiff and accused him of making an error the day before.

26. Smith disciplined Plaintiff in writing for his alleged error, and although Plaintiff had done nothing wrong, he tried to put the incident behind him.

27. In February 2020, Plaintiff and his family decided it was in their best interest for several members of their household to work from home due to the ongoing COVID-19 pandemic.

28. Plaintiff did not have such an option due to his essential worker status, and continued reporting to work each day.

29. Because of the known impact of COVID-19 on the respiratory system and the fact that his child had a respiratory condition, Plaintiff took it upon himself to begin wearing a face covering in and around the Smithfield facility as a safety precaution.

30. On May 1, 2020, Plaintiff reported to work as normal while wearing a mask. Upon entering the facility, Plaintiff passed Smith.

31. Instead of acknowledging Plaintiff's concern for the safety of himself and his family, Smith admonished Plaintiff for wearing a mask, instructing him not to wear it at work or near the building because it could stir up "paranoia" and "create panic."

32. Plaintiff tried to explain his child's condition, but Smith would have none of Plaintiff's reasoning.

33. This constituted notice of Plaintiff's protected disability class to Smithfield and was a protected complaint regarding safety surrounding the COVID-19 pandemic.

4

34. Smith then ordered Plaintiff to take off the mask and threatened to involve Brad Keyfavor, the plant manager, if Plaintiff did not comply with his instructions. Plaintiff removed his mask as demanded.

35. Even though Plaintiff had followed instructions, Smith refused to drop the mask issue.

36. Smith met with Rafael Baez, the manufacturing manager and Plaintiff's brother, and asked Rafael Baez to make sure that Plaintiff was not wearing a mask.

37. Even though Rafael Baez knew about the danger of exposure to COVID-19 for his asthmatic family, he reminded Plaintiff that masks were not to be worn in the facility due to internal policy.

38. Plaintiff's compliance with Smith's instructions proved to be to his own detriment.

39. A few weeks later, on or about May 23, 2020, Smithfield notified its employees that they were offering free COVID-19 testing.

40. Plaintiff had been feeling like he may have symptoms, so he took one of these offered tests. It returned a positive result for COVID-19, and Plaintiff was sent home.

41. Less than one week later, Smith called Plaintiff and demanded that he return to work.

42. Even though he knew that Plaintiff had only tested positive for COVID-19 a few days prior, Smith threatened to stop paying Plaintiff if he did not return to work.

43. Although Plaintiff did not feel like his symptoms had subsided, he relied on the income from Smithfield to support his family, so he submitted himself to another COVID-19 test the next day.  This test again returned a positive result, and again Plaintiff was sent home.

44. Although both tests were performed at Smithfield facilities, Smith refused to accept the validity of Plaintiff's test results and demanded another test less than a week later.

5

45. Smith's harassment of Plaintiff did not stop at two tests. It continued for the next two and a half months.

46. At Smith's request, Plaintiff was subject to weekly tests from his initial positive test on May 23, 2020 until nearly the end of August 2020, when he finally tested negative and was able to return to work.

47. During this period, all of Plaintiff's weekly tests came back positive, and the repeated invasive nature of the testing procedure caused Plaintiff to develop other symptoms including sinus pain, headaches, and nosebleeds.

48. When Plaintiff returned to work in August, it had become common practice at the facility to wear masks at work.

49. Smithfield had instituted a policy requiring employees to wear company-provided masks while in the building.

50. Because of his first-hand experience with this deadly disease, Plaintiff erred on the side of caution and wore his own mask underneath the company-provided disposable mask at work.

51. Even though many other employees were taking similar precautions, Plaintiff was stopped and again admonished for his commitment to safety.

52. Allison Jones, a supervisor in the quality control department, stopped Plaintiff in the hallway and told him not to wear both masks at once.

53. Jones informed him that Smithfield's rules stated that employees were to wear only company-provided disposable masks in the facility.

54. Again, Plaintiff complied with Smithfield's policy despite the potential consequences to his own safety, though he also made a protected complaint of unsafe working conditions caused by refusing to allow him to wear the extra mask.

55. Plaintiff settled back into his new routine of wearing only company provided masks and reporting to work at the facility each day.

56. Plaintiff hoped to put the past few months behind him and was optimistic that Smith's discriminatory targeting had come to an end. Unfortunately, this was not the case.

57. About a week after Plaintiff returned to work, he was vaping outside during break next to a designated smoking area and Smith approached him.

58. Even though Plaintiff had been only person in the area, Smith targeted him, reminding Plaintiff that he was not in the designated smoking area.

59. When Plaintiff responded and explained that he believed the matter was a non-issue because of his solitude and the fact that he was vaping and not smoking, Smith physically grabbed Plaintiff's shoulders and moved him to the designated smoking area.

60. Plaintiff took this opportunity to ask Smith why he only applied these types of rules to Plaintiff (another protected complaint of discrimination) but received no response.

61. Plaintiff again tried to put the incident behind him and returned to work.

62. A few weeks later, Whitney Jackson, an hourly employee of mixed-race descent, was transferred to work under Plaintiff.

63. Jackson had a reputation as a troublemaker and had been transferred to different departments multiple times during her employment with Smithfield.

7

64. Jackson's reputation was acknowledged by Superintendent Mike Khuman, a Caucasian male, who took it upon himself to warn Plaintiff and his supervisory staff that Jackson was likely to cause trouble in their department.

65. The next day, Jackson reported to work to find that the other hourly workers were watching her.

66. A significant majority of the hourly workers were of Hispanic heritage and it was common for these employees to speak Spanish in and around the Smithfield facility.

67. As a new hire in the department, it is likely that other employees would observe Jackson more closely than their more familiar colleagues.

68. Jackson joked with the other hourly employees, asking them if they've ever seen a new hire before.

69. Both Jackson's direct supervisor, Joe Okwoko, and Plaintiff (who was never her direct supervisor but did split Saturday shifts with Okwoko as supervisor, discussed infra) laughed at her joke, and the department staff continued about their business.

70. Over the next few weeks, Jackson and Okwoko became close colleagues. Okwoko is of African descent.

71. Jackson regularly stopped by the office to converse with Okwoko on breaks.

72. Plaintiff, who shared office space with Okwoko, noticed their relationship, and even overheard them talking about going to a casino together.

73. Khuman also noticed the relationship between Okwoko and Jackson but elected not to mention it.

74. Plaintiff followed Khuman's example, decided not to mention their relationship, and instead continued to carry out his work duties.

8

75. On or around Saturday, December 5, 2020, Plaintiff reported to work as usual.

76. Plaintiff and Okwoko usually split Saturday shifts to allow for each of them to spend some much-needed time with their families.

77. On this Saturday, Plaintiff was charged with oversight of the hourly employees' operations.

78. Several hours into the shift, an hourly employee came to Plaintiff and informed him that Jackson was not wearing her personal protective equipment ("PPE") in the correct manner.

79. Plaintiff spoke with Jackson and found that her face shield was up, not covering her face as intended.

80. Plaintiff asked her to fix the shield's position and wear it properly, but Jackson immediately took a bad attitude with Plaintiff, responding "if I have to pull the stupid shield down, I'd rather go home."

81. Plaintiff informed her that if she cannot or will not comply with PPE requirements, she should go home.

82. Realizing that Plaintiff took safety seriously, Jackson instead asked for a new face shield.

83. While Plaintiff turned to look for someone to cover Jackson's position and allow her to fix her shield, Jackson said, "fuck this" and stormed off from her workspace, throwing the helmet and expensive cut-resistant gloves into the handwashing station trash can.

84. Instead of following her, Plaintiff set to work finding someone to replace Jackson's spot that day.

85. After staffing Jackson's spot, Plaintiff returned to the office to report Jackson's conduct and the incident that had just taken place.

86. Along the way, Plaintiff washed his hands and noticed Jackson's expensive PPE in the trash.

9

87. Plaintiff attempted to reach Khuman by phone, and unable to do so, he contacted Rafael Baez.

88. After Plaintiff explained Jackson's conduct, Rafael Baez assured Plaintiff that the incident was solely Jackson's problem and instructed Plaintiff to write an email detailing Jackson's conduct.

89. At the same time as Plaintiff's conversation with Rafael Baez, Jackson moved to a facility hallway and began calling out about wanting "someone to fuck him [referring to Plaintiff] up."

90. Jackson continued to exclaim bigoted remarks about her fellow co-workers, including that they likely hate her because she can't speak Spanish and making comments about immigrants of Hispanic heritage.

91. Monica Morehaus, a quality control supervisor, was able to calm Jackson and convince her to contact human resources regarding the incident.

92. Human resources instructed Jackson to collect her helmet and other articles of PPE, but she lied to them, stating that they were left at her workstation when in reality they had been thrown in the trash as the result of her violent tantrum.

93. The following Monday, Smith met with Plaintiff to inquire about the events of the Saturday before.

94. Smith asked Plaintiff for a report, and Plaintiff responded, providing information that Jackson had thrown her helmet and walked off from her workspace.

95. At the conclusion of their meeting, Smith asked Plaintiff if there was anything else he wished to report, and Plaintiff responded that he had nothing further.

96. Plaintiff then left Smith's office and carried on with his workday.

97. One day later, Smith called another meeting, this time with both Khuman and Plaintiff.

98. At this meeting, Smith asked Plaintiff and Khuman for more information regarding Jackson's previous reports that people were staring at her.

99. Plaintiff responded, informing Smith that both he and Okwoko, Jackson's direct supervisor, were aware of her comments on people staring.

100.    Smith inquired why the issue had not been reported, and Plaintiff informed Smith that he felt Okwoko was in a better position to provide complete information about the incident as Jackson's direct supervisor.

101.    Smith then accused Plaintiff of harassing Jackson and asked for another written statement by Plaintiff on the incident, to which Plaintiff responded by denying any harassment of Jackson and reminding Smith to take steps to investigate the matter further as he was not the only supervisor involved in the situation.

102.    Okwoko later denied having a close relationship with Jackson.

103.    Almost two weeks after Plaintiff's meeting with Khuman and Smith, on December 18, 2020, Smithfield terminated Plaintiff's employment for allegedly harassing Jackson.

104.    Throughout his employment, Plaintiff made numerous complaints about unsafe working conditions to himself and others, failing to follow PPE requirements, and general failures to prevent the spread of COVID-19.

105.    Plaintiff also made multiple complaints of discrimination during his employment.

106.    Shortly after Plaintiff's protected complaints, Smithfield terminated his employment.

107.    Throughout Plaintiff's employment with Smithfield, he was frequently singled out because of his race and national origin.

11

108.     Plaintiff was most frequently targeted by Smith, a member of the plant's human resources.

109.     Smith forced Plaintiff to remove his own personal protective equipment when similarly situated employees of other races were not required to do so.

110.     Once Plaintiff was confirmed to be infected with COVID-19, Smith made a practice of further targeting Plaintiff by requiring repetitive testing to prove his positive status during his recovery.

111.     Upon information and belief, this requirement was not forced upon his U.S.-born, Caucasian colleagues.

112.     After spending nearly two months in recovery, Plaintiff returned to work and faced further discrimination.

113.     Within one week of his return, Allison Jones, a supervisor in a different department, stopped Plaintiff and informed him that company policy was to only wear disposable masks provided by the plant.

114.     Jones instructed him to remove the second mask that he had been wearing underneath his company-provided disposable face covering.

115.     Although many other employees were wearing the same PPE as Plaintiff, he was disparately the only person told to change his face covering.

116.     Demanding that Plaintiff jeopardize his own personal safety was not enough for management at Smithfield.

117.     In or around late summer 2020, the disparate treatment continued when Smith went out of his way to physically move Plaintiff a few steps into a designated smoking area.

12

118.    Although Plaintiff was the only person in the plant's outdoor break area at the time and was vaping instead of smoking, Smith chose to single him out and enforce rules on Plaintiff much more strictly than on other employees.

119.    Plaintiff responded, informing Smith that other employees frequently violate the smoking area rules, but Smith insisted on singling Plaintiff out, and moved him to the smoking area by his shoulders.

120.    Had Smith chosen to focus on his job duties instead of hyper-scrutinizing Plaintiff's every move, this incident would have gone completely unnoticed.

121.    To continue this pattern of discriminatory behavior, Smithfield allowed Jackson and Okwoko, two employees of non-Hispanic descent, to have a relationship that led to obvious favoritism in the workplace.

122.    Although Okwoko and Jackson's relationship crossed multiple boundaries, including talk of fraternization outside of work at a casino, Plaintiff was accused of harassing Jackson by sharing details about his life with her and showing her the scar from his appendix removal (which she asked him to show her).

123.    Jackson got along with other supervisory staff, but did not agree with many of her co-workers or Plaintiff because of their heritage.

124.    Indeed, after destroying expensive PPE out of anger, Jackson called out that she "wanted someone to fuck [Plaintiff] up," and accusing him of hating her for only speaking English.

125.    Jackson further commented on the fact that many of her co-workers were immigrants in a derogatory way.

13

126.    When Plaintiff reported this incident to human resources (a protected complaint), Smith continued to target him.

127.    Despite that both Plaintiff and Khuman were in the meeting to discuss Jackson's outburst, Smith asked only Plaintiff questions about his own conduct.

128.    Instead of investigating the situation in an unbiased manner, Smith made assumptions about fault and assumed that Plaintiff was in the wrong because of his race.

129.    Rather than fire or even reprimand Jackson, a known troublemaker who clearly harbored discriminatory attitudes toward Hispanic people, Smith chose to allege harassment violations against Plaintiff and terminate his employment with Smithfield for discriminatory reasons.

130.    At the onset of the COVID-19 pandemic, Plaintiff decided to err on the side of caution and wear a protective face covering at work.

131.    Plaintiff did so in order to protect his asthmatic child from COVID-19, a virus known to have harsh respiratory symptoms.

132.    Since Plaintiff's child was at higher risk for COVID-19 complications due to their asthma, Plaintiff felt it was best to wear a mask.

133.    When Plaintiff entered the Smithfield facility on May 1, 2020, Smith instructed Plaintiff to remove his mask because he felt it could "cause panic."

134.    Plaintiff explained that he was wearing the mask as a precaution and that his child had a respiratory condition and was therefore higher risk (thus, giving notice of his protected disability class by association), but Smith refused to allow the mask.

14

135.    To make matters worse, Rafael Baez, Plaintiff's brother and the manufacturing manager of the plant, reinforced Smith's instructions, telling Plaintiff not to wear the mask even though he knew of the child's condition.

136.    Plaintiff was treated differently than other employees whose children did not have asthma.

137.    Since Smithfield knew of Plaintiff's disability by association and refused the simplest of accommodations, it clearly discriminated against him on the basis of disability.

138.    Around the end of November 2020, Plaintiff shared exciting news with management that he and his wife were expecting another baby.

139.    Plaintiff informed manufacturing manager Rafael Baez, as well as Khuman, of his expected new family member.

140.    Less than a month passed between this conveyance of information and Plaintiff's termination.

141.    Smithfield directly retaliated against Plaintiff for reporting Jackson's outburst.

142.    Plaintiff, in carrying out his supervisory duties, reported Jackson's conduct to human resources.

143.    Instead of investigating Jackson's behavior, Smith targeted Plaintiff and immediately began to question Plaintiff's conduct.

144.    Smith had a history of singling Plaintiff out and applying rules more strictly to him than other plant employees.

145.    Further, when Smith accosted Plaintiff while vaping in the smoking area, Plaintiff specifically complained that the rules were only being enforced on him, and not on others – another protected complaint.

15

146.     Smith's final act of targeting against Plaintiff came when Plaintiff was unfairly terminated for alleged harassment violations against Jackson.

147.     Additionally, roughly one week after Plaintiff's termination, an unknown person fired a shot into Smithfield's break room.

148.     A few months after that event, Plaintiff was questioned by the police.

149.     Presumably, Smithfield reported Plaintiff to the police at that time – an adverse action against him, showing additional desire to retaliate against him post-employment for his previous issues.

150.     After Plaintiff tested positive for COVID-19, he was sent on medical leave.

151.     Not one day afterwards, Smith called Plaintiff, demanding that he complete a second COVID-19 test.

152.     No other employees were forced to undergo two rounds of testing at the start of their illness.

153.     The CDC recommends isolation for people that have tested positive for COVID-19 within the last 14 days, but Smith did not care.

154.     Smith wanted Plaintiff back to work as soon as possible, so he demanded that Plaintiff submit weekly COVID-19 test results.

155.     Smith threatened to stop paying Plaintiff if he did not return to work. Plaintiff, needing income, complied with Smith's instructions and completed weekly tests.

156.     Each of Plaintiff's tests returned positive from the initial test on May 23, 2020, until nearly the end of August.

157.     During his recovery, Plaintiff had to submit to at least fourteen invasive COVID-19 tests to prove that he was indeed sick.

16

158.    Instead of trusting his employee, Smith demanded test results and harassed Plaintiff while in recovery.

159.    Almost immediately after Plaintiff tested negative and returned to work from the medical leave, Smithfield started conveniently finding and/or creating a basis to terminate Plaintiff.

160.    Notably, at no point during Plaintiff's employment did Smithfield ever discuss FMLA with him, despite knowing of his serious health condition.

161.    In February 2020, Plaintiff began to express concern over the growing threat of the COVID-19 pandemic.

162.    Instead of recognizing Plaintiff's safety mindset and encouraging him to use his best judgement, Smithfield admonished him and forced him under threat of escalation to remove PPE that Plaintiff felt was necessary.

163.    Unsurprisingly, several weeks later, Plaintiff contracted the very virus he was trying to avoid, possibly even while at work for Smithfield.

164.    Once Plaintiff had returned from medical leave for COVID-19 recovery, he tried to exercise extra caution by layering his own face covering underneath the one provided by Smithfield.

165.    In February 2021, the CDC recognized wearing two masks as a better practice to slow the spread of COVID-19.

166.    However, Plaintiff was stopped by another supervisor and told to remove his additional layer of protection.

167.    Plaintiff's commitment to COVID-19 safety did not falter.

17

168.     Several months later, Jackson was not wearing her assigned PPE in the proper manner.

169.     Plaintiff took steps to remedy the issue, finding someone to perform Jackson's duties while she obtained new equipment.

170.     Instead of recognizing Plaintiff's commitment to safety for himself and his coworkers, Smithfield terminated his employment unfairly.

171.     Despite Plaintiff's previously positive employment record, Smithfield conveniently found or created a basis to terminate Plaintiff almost immediately after Plaintiff took reasonable steps to ensure his own safety and the safety of other Smithfield employees.

172.     Smithfield's purported reason(s), or lack thereof, for Plaintiff's employment termination was clearly pretextual.

173.     Smithfield actually terminated Smithfield's employment discriminatorily against his family's actual or perceived disability, his race, his national origin, to prevent himf rom using his protected FMLA rights, in retaliation against his protected complaints, and/or in violation of public policy.

174.     As a result of the above, Plaintiff has suffered and will continue to suffer damages.

## COUNT I: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112, *et seq.*

175.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

176.     Plaintiff is in a protected class for his and his associate's disabilities (described *supra*).

177.     R.C. § 4112 *et seq.* provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disabilities.

18

178.    Defendant treated Plaintiff differently than other similarly situated employees based upon his disability.

179.    Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Plaintiff differently from other similarly situated employees outside his protected class.

180.    Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Plaintiff' disability.

181.    Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Plaintiff' disability.

182.    Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

183.    As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer damages.

### COUNT II: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

184.    Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

185.    Plaintiff is in a protected class for his and his associate's disabilities (described *supra*).

186.    The ADA provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability.

187.    Defendant treated Plaintiff differently than other similarly situated employees based upon his disability.

188.    Defendant violated the ADA by treating Plaintiff differently from other similarly situated employees outside his protected class.

19

189.     Defendant violated the ADA by applying its employment policies in a disparate manner based on Plaintiff's disability.

190.     Defendant violated the ADA by applying its disciplinary policies in a disparate manner based on Plaintiff's disability.

191.     Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

192.     Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

193.     As a direct and proximate result of Defendant's failure to promote Plaintiff based upon race discrimination, Plaintiff has suffered and will continue to suffer damages.

## COUNT III: RACIAL DISCRIMINATION IN VIOLATION OF R.C. §4112, *et seq.*

194.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

195.     Plaintiff is African American, and thus is in a protected class for his race.

196.     R.C. § 4112 *et seq.* provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

197.     Defendant treated Plaintiff differently than other similarly situated employees based upon his race.

198.     Defendant's termination of Plaintiff was an adverse employment action against him.

199.     Defendant's purported reason(s) for Plaintiff's termination was pretextual.

200.     Defendant actually terminated Plaintiff's employment due to his race.

201.     Defendant violated R.C. § 4112 *et seq.* by terminating Plaintiff because of his race.

20

202.    Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Plaintiff differently from other similarly situated employees outside his protected class.

203.    Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Plaintiff's race.

204.    Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Plaintiff's race.

205.    Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

206.    As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer damages.

### COUNT IV: RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII

207.    Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

208.    Plaintiff is African American, and thus is in a protected class for his race.

209.    Title VII provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

210.    Defendant treated Plaintiff differently than other similarly situated employees based upon his race.

211.    Defendant's termination of Plaintiff was an adverse employment action against him.

212.    Defendant's purported reason for Plaintiff's termination was pretextual.

213.    Defendant actually terminated Plaintiff's employment due to his race.

214.    Defendant violated Title VII by terminating Plaintiff because of his race.

21

215.     Defendant violated Title VII by treating Plaintiff differently from other similarly situated employees outside his protected class.

216.     Defendant violated Title VII by applying its employment policies in a disparate manner based on Plaintiff's race.

217.     Defendant violated Title VII by applying its disciplinary policies in a disparate manner based on Plaintiff's race.

218.     Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

219.     As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer damages.

## COUNT V: NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF R.C. §4112, *et seq.*

220.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

221.     Plaintiff was born in the Dominican Republic, and thus is in a protected class for his national origin.

222.     R.C. § 4112 *et seq.* provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's national origin.

223.     Defendant treated Plaintiff differently than other similarly situated employees based upon his national origin.

224.     Defendant's termination of Plaintiff was an adverse employment action against him.

225.     Defendant's purported reason(s) for Plaintiff's termination was pretextual.

22

226.     Defendant actually terminated Plaintiff's employment due to his national origin.

227.     Defendant violated R.C. § 4112 *et seq.* by terminating Plaintiff because of his national origin.

228.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Plaintiff differently from other similarly situated employees outside his protected class.

229.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Plaintiff's national origin.

230.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Plaintiff's national origin.

231.     Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

232.     As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer damages.

## COUNT VI: NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII

233.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

234.     Plaintiff was born in the Dominican Republic, and thus is in a protected class for his national origin.

235.     Title VII provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's national origin.

236.     Defendant treated Plaintiff differently than other similarly situated employees based upon his national origin.

237.     Defendant's termination of Plaintiff was an adverse employment action against him.

238.     Defendant's purported reason for Plaintiff's termination was pretextual.

239.     Defendant actually terminated Plaintiff's employment due to his national origin.

240.     Defendant violated Title VII by terminating Plaintiff because of his national origin.

241.     Defendant violated Title VII by treating Plaintiff differently from other similarly situated employees outside his protected class.

242.     Defendant violated Title VII by applying its employment policies in a disparate manner based on Plaintiff's national origin.

243.     Defendant violated Title VII by applying its disciplinary policies in a disparate manner based on Plaintiff's national origin.

244.     Plaintiff incurred emotional distress damages as a result of Defendant's conduct described herein.

245.     As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer damages.

## COUNT VII: REVERSE SEX/GENDER DISCRIMINATION IN VIOLATION OF R.C. § 4112 *et seq.*

246.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

247.     Throughout his employment, Plaintiff was qualified for and could fully perform his essential job duties.

248.     Plaintiff is a male/man, and thus is in a protected class for his sex/gender.

249.     Defendant is that unique employer that discriminates against the majority.

24

250.     Defendant treated Plaintiff differently than other similarly situated employees based on his sex/gender.

251.     Defendant discriminated against Plaintiff on the basis of his sex/gender throughout his employment with the company.

252.     During his employment with Defendant, Plaintiff was subjected to offensive and harassing conduct based on his actual and/or perceived sex/gender from his superiors, coworkers, and customers.

253.     Defendant treated Plaintiff differently than other similarly situated employees based upon his sex/gender.

254.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Plaintiff differently from other similarly situated employees outside his protected class.

255.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Plaintiff's sex/gender.

256.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Plaintiff's sex/gender.

257.     Defendant treated Plaintiff differently than other similarly situated employees based upon his sex/gender.

258.     Defendant's termination of Plaintiff was an adverse employment action against him.

259.     Defendant's purported reason for Plaintiff's termination was pretextual.

260.     Defendant actually terminated Plaintiff's employment due to his sex/gender.

261.     Defendant violated R.C. § 4112 et seq. by terminating Plaintiff because of his sex/gender.

25

262.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Plaintiff differently from other similarly situated employees outside his protected class.

263.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its employment policies in a disparate manner based on Plaintiff's sex/gender.

264.     Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying its disciplinary policies in a disparate manner based on Plaintiff's sex/gender.

265.     Plaintiff suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

266.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages.

## COUNT VIII: REVERSE SEX/GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

267.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

268.     Throughout his employment, Plaintiff was qualified for and could fully perform his essential job duties.

269.     Plaintiff is a male/man, and thus is in a protected class for his sex/gender.

270.     Defendant is that unique employer that discriminates against the majority.

271.     Defendant treated Plaintiff differently than other similarly situated employees based on his sex/gender.

272.     Defendant discriminated against Plaintiff on the basis of his sex/gender throughout his employment with the company.

26

273.     During his employment with Defendant, Plaintiff was subjected to offensive and harassing conduct based on his actual and/or perceived sex/gender from his superiors, coworkers, and customers.

274.     Defendant treated Plaintiff differently than other similarly situated employees based upon his sex/gender.

275.     Defendant violated Title VII by treating Plaintiff differently from other similarly situated employees outside his protected class.

276.     Defendant violated Title VII by applying its employment policies in a disparate manner based on Plaintiff's sex/gender.

277.     Defendant violated Title VII by applying its disciplinary policies in a disparate manner based on Plaintiff's sex/gender.

278.     Defendant treated Plaintiff differently than other similarly situated employees based upon his sex/gender.

279.     Defendant's termination of Plaintiff was an adverse employment action against him.

280.     Defendant's purported reason for Plaintiff's termination was pretextual.

281.     Defendant actually terminated Plaintiff's employment due to his sex/gender.

282.     Defendant violated Title VII by terminating Plaintiff because of his sex/gender.

283.     Defendant violated Title VII by treating Plaintiff differently from other similarly situated employees outside his protected class.

284.     Defendant violated Title VII by applying its employment policies in a disparate manner based on Plaintiff's sex/gender.

27

285.     Defendant violated Title VII by applying its disciplinary policies in a disparate manner based on Plaintiff's sex/gender.

286.     Plaintiff suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages pursuant to Title VII.

287.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages.

## COUNT IX: PREGNANCY DISCRIMINATION IN VIOLATION OF R.C. § 4112 et seq.

288.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

289.     Plaintiff is a member of a statutorily protected class based on his sex/gender and his wife's pregnancy under R.C. § 4112 et seq.

290.     Plaintiff was qualified for and could fully perform the essential functions of his job.

291.     During his employment with Defendant, Plaintiff disclosed his wife was pregnant to Defendant.

292.     Defendant had notice of Plaintiff's wife's pregnancy.

293.     Defendant treated Plaintiff differently than other similarly situated employees based on his wife's pregnancy.

294.     Defendant discriminated against Plaintiff on the basis of his wife's pregnancy throughout the end of his employment.

295.     Defendant terminated Plaintiff's employment.

296.     Defendant's termination of Plaintiff was an adverse employment action against him.

297.     Defendant's cited reason(s) for Plaintiff's termination are pretextual.

E-FILED 05/11/2022 03:27 PM  /  CONFIRMATION 1188654  /  A 2201692  /  COMMON PLEAS DIVISION  /  IFOJ

298.   Defendant actually terminated Plaintiff because of his wife's pregnancy.

299.   Defendant violated R.C. § 4112 et seq. when it terminated Plaintiff's employment

based on his wife's pregnancy.

300.   Defendant's discrimination against Plaintiff based on his wife's pregnancy

violates R.C. § 4112 et seq.

301.   As a direct and proximate result of Defendant's conduct, Plaintiff suffered and

will continue to suffer damages.

### COUNT X: PREGNANCY DISCRIMINATION IN VIOLATION OF TITLE VII

302.   Plaintiff restates each and every prior paragraph of this Complaint, as if it were

fully restated herein.

303.   Plaintiff is a member of a statutorily protected class based on his sex/gender and

his wife's pregnancy under Title VII as amended.

304.   Plaintiff was qualified for and could fully perform the essential functions of his job.

305.   During his employment with Defendant, Plaintiff disclosed his wife was pregnant

to Defendant.

306.   Defendant had notice of Plaintiff's wife's pregnancy.

307.   Defendant treated Plaintiff differently than other similarly situated employees

based on his wife's pregnancy.

308.   Defendant discriminated against Plaintiff on the basis of his wife's pregnancy

throughout the end of his employment.

309.   Defendant terminated Plaintiff's employment.

310.   Defendant's termination of Plaintiff was an adverse employment action against

him.

29

311. Defendant's cited reason(s) for Plaintiff's termination are pretextual.

312. Defendant actually terminated Plaintiff because of his wife's pregnancy.

313. Defendant violated Title VII as amended when it terminated Plaintiff's employment based on his wife's pregnancy.

314. Defendant's discrimination against Plaintiff based on his wife's pregnancy violates Title VII as amended.

315. As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer damages.

## COUNT XI: RETALIATION

316. Plaintiff restates each and every prior paragraph of this complaint, as if it were fully restated herein.

317. As a result of the Defendant's discriminatory conduct described above, Plaintiff complained of the discrimination, harassment, and disparate treatment he was experiencing.

318. Subsequent to Plaintiff's complaints to management about harassment, bullying, and disparate treatment toward him, Defendant took adverse employment actions against Plaintiff, including terminating his employment.

319. Defendant's actions were retaliatory in nature based on Plaintiff's opposition to the unlawful discriminatory conduct.

320. Pursuant to R.C. § 4112 *et seq.*, the ADA, and Title VII, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

30

321.     As a direct and proximate result of Defendant's retaliatory discrimination against and discharge of Plaintiff, he has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT XII:  UNLAWFUL INTERFERENCE WITH FMLA RIGHTS

322.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

323.     Pursuant to 29 U.S.C. § 2601 *et seq.*, covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

324.     Defendant is a covered employer under the FMLA.

325.     Plaintiff was an employee eligible for FMLA due to his severe health conditions (his COVID-19 diagnosis).

326.     During his employment, Plaintiff qualified for and inquired about FMLA leave due to his serious health conditions.

327.     During his employment with Defendant, Plaintiff was unable to receive FMLA benefits for his serious health conditions.

328.     Defendant unlawfully interfered with Plaintiff' exercise of his rights under the FMLA in violation of § 105 of the FMLA and § 825.220 of the FMLA regulations.

329.     Defendant's refusal to provide Plaintiff with information pertaining to FMLA leave and/or permit Plaintiff to take FMLA leave violated and interfered with his FMLA rights.

330.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer damages.

31

331.     As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorneys' fees.

## COUNT XIII: UNLAWFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

332.     Plaintiff restates each and every prior paragraph of this Complaint as if it were fully restated herein.

333.     A clear public policy exists and is manifested in Ohio Public Health orders from the Ohio Department of Health and the Governor's Office allowing employees to quarantine while waiting for COVID-19 test results.

334.     A clear public policy exists and is manifested in O.R.C. § 4101.11 stating that "[e]very employer shall furnish employment which is safe for the employees engaged therein," and "[n]o employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe. . ."

335.     Defendant's termination of Plaintiff jeopardizes these public policies.

336.     Defendant's termination of Plaintiff was motivated by conduct related to these public policies.

337.     Defendant had no overriding business justification for terminating Plaintiff.

338.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages.

## COUNT XIV: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

339.     Plaintiff restates each and every prior paragraph of this Complaint, as if it were fullyrestated herein.

340.     A clear public policy exists and is manifested in Ohio statutes, including R.C. §

32

4101.11 and/or § 4101.12, and/or administrative regulations, or in the common law, in favor of providing workers with a healthy and safe work environment, and against terminating an employee based on complaints of unsafe working conditions and unsafe conditions for patients and the public.

341.     As set forth above, Plaintiff made reports to Defendant about the unethical, unlawful, and/or policy-violating behavior that was going on there, including unsafe working conditions (*supra*).

342.     Defendant failed to adequately address Plaintiff's complaints.

343.     Soon after Plaintiff made the protected complaints to her supervisor, Defendant took adverse employment actions against Plaintiff, including, but not limited to, terminating her employment.

344.     The temporal proximity between Plaintiff's complaints and her employment termination implies that she was actually terminated in retaliation for making her protected complaints.

345.     Defendant's termination of Plaintiff's employment jeopardizes these public policies.

346.     Defendant's termination of Plaintiff's employment was motivated by conduct related to these public policies.

347.     Defendant had no overriding business justification for terminating Plaintiff's employment.

348.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer damages.

**<u>DEMAND FOR RELIEF</u>**

WHEREFORE, Plaintiff demands from Defendant the following:

33

a) Issue a permanent injunction:

    i.   Requiring Defendant to abolish discrimination, harassment, and retaliation;

    ii.   Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii.   Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.   Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.   Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge Plaintiff's personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Plaintiff for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Plaintiff's claims as allowable under law;

34

f)   An award of the taxable costs of this action; and

g)   An award of such other relief as this Court may deem necessary and proper.

35

Respectfully submitted,


   /s/ Evan R. McFarland
Evan R. McFarland (0096953)
Matthew G. Bruce (0083769)
        Trial Attorney
Brianna R. Carden (0097961)
SPITZ, THE EMPLOYEE'S LAW FIRM
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, OH 45246
Phone: (216) 291-0244 x173
Fax:    (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com
Email: Brianna.Carden@SpitzLawFirm.com

Attorneys for Plaintiff Ramon Baez

36

## **JURY DEMAND**

Plaintiff Ramon Baez demands a trial by jury by the maximum number of jurors permitted.

/s/ Evan R. McFarland
Evan R. McFarland (0096953)

37